IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HERLEY INDUSTRIES, INC. | : | CIVIL ACTION |
| | : | |
| v. | : | No.: 08-5377 |
| | : | |
| FEDERAL INSURANCE COMPANIES, INC. | : | |

**MEMORANDUM AND ORDER**

**Juan R. Sánchez, J.**                                                                                                **August 21, 2009**

      This is an insurance coverage dispute arising out of a criminal action brought against Herley Industries, Inc., a designer and manufacturer of microwave systems and electronic components for the defense and aerospace industries, and Lee Blatt, Herley's former CEO and Chairman of the Board;[1] a securities action brought against Herley and its officers and directors; and a shareholders' derivative action brought against Herley directors.  Herley seeks insurance coverage under a policy issued by Defendant Federal Insurance Companies, Inc. for the costs of defending Blatt's criminal action and the securities and derivative litigation.  Federal contends the fraud/willful violation and illegal profits[2] exclusions of the policy bar coverage for these claims.

---

[1] Blatt's employment as CEO was terminated "without cause" by Herley's Board of Directors.  On June 8, 2006, Blatt resigned as Chairman of the Board of Directors, a position he had held since Herley's formation in 1965.

[2] There are two Illegal Profits Exclusion clauses in the policy.  Exclusion 7(b) provides Federal would not be liable for any claim:

> (b)    based upon, arising from, or in consequence of such Insured Person having gained in fact any profit, remuneration or other advantage to which such Insured Person was not legally entitled . . . .

Policy, Pl. Ex. A, Exclusion 7, FED 0648; Endorsement No. 6, FED 0669.  Exclusion 8(a) provides Federal shall not be liable for any securities claim:

**FACTS**

The insurance policy at issue is the Executive Protection Portfolio, Policy Number 8156-3872. Herley purchased the policy from Federal to cover executive, entity securities, and fiduciary liability for the period July 31, 2005, to July 31, 2006. Herley, its subsidiaries, and Insured Persons are the insured under the policy. Insured Persons include former, current, and future directors, officers, and managers of Herley. Under the policy, Federal agreed to indemnify Herley up to $10 million for loss "on account of any Claim first made against the Insured Person" during the policy period "for a Wrongful Act committed, attempted, or allegedly committed or attempted by such Insured Person before or during the Policy Period . . .". Policy, Pl. Ex. A, FED 0642. Federal also agreed to cover Herley for loss "on account of any Securities Claim" made against Herley during the policy period "for a Wrongful Act committed, attempted, or allegedly committed or attempted" by Herley or the Insured Persons before or during the policy period.[3]  Policy, Pl. Ex. A, FED 0642.

---

    (a)    based upon, arising from, or in consequence of [Herley] having gained in fact any profit, remuneration or other advantage to which [Herley] was not legally entitled . .

Policy, Pl. Ex. A, Exclusion 8, FED 0649; Endorsement No. 6, FED 0669. Because this Court concludes the Willful Violation Exclusion bars Herley's claims against Federal, it is unnecessary to determine whether the Illegal Profits Exclusion also bars Herley's claims.

[3]The policy, as amended by Endorsement No. 4, defines "claim" as: "a written demand for monetary damages or non-monetary relief," "a civil proceeding commenced by the service of a complaint or similar pleading," "a formal civil administrative or civil regulatory proceeding commenced by the filing of a notice of charges or similar document or by the entry of a formal order of investigation or similar document," or "a criminal proceeding commenced by the return of an indictment," against an Insured Person or Herley for a Wrongful Act.  Wrongful Act is defined as "(a) any error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed, attempted, or allegedly committed or attempted by an Insured Person in his or her Insured Capacity, or for purposes of coverage under Insuring Clause 3, by the Organization, or (b) any other matter claimed against an Insured Person solely by reason of his or her serving in an Insured Capacity." Policy, Pl. Policy, Pl. Ex. A, FED 0643; FED 0647.

The policy provides the following relevant exclusions, as amended by Endorsement No. 6.[4]

Exclusion 7 of the policy provides Federal shall not be liable for any claim:

(b) based upon, arising from, or in consequence of such Insured Person having gained in fact any profit, remuneration or other advantage to which such Insured Person was not legally entitled; or

(c) based upon, arising from, or in consequence of any deliberately fraudulent act or omission or any willful violation of any statute or regulation by such Insured Person, if a judgment or other final adjudication establishes such a deliberately fraudulent act or omission or willful violation.

Policy, Pl. Ex. A, Exclusion 7, FED 0648; Endorsement No. 6, FED 0669.  Exclusion 8 provides

Federal shall not be liable for any securities claim:

(a) based upon, arising from, or in consequence of [Herley] having gained in fact any profit, remuneration or other advantage to which [Herley] was not legally entitled; or

(b) based upon, arising from, or in consequence of any deliberately fraudulent act or omission or any willful violation of any statute or regulation by [Herley] or by any past, present or chief financial officer, in-house general counsel, president, chief executive officer or chairperson of [Herley], if a judgment or other final adjudication establishes such a deliberately fraudulent act or omission or willful violation . . . .

Policy, Pl. Ex. A, Exclusion 8, FED 0649; Endorsement No. 6, FED 0669.

On June 6, 2006, the United States Government brought the underlying criminal action against Blatt and Herley with the filing of a thirty-five-count Indictment against both – twenty-nine counts of wire fraud, two counts of obstructing a federal audit, one count of committing a major fraud against the United States, and three counts of making false statements to the government.  On

---

[4]Each of the Endorsements to the policy states at the beginning that it forms "a part of Policy No. 8156-3872."  The insurance contract therefore consists of the policy as modified by the Endorsements.

3

January 30, 2007, the Government filed a Superseding Indictment, which, with the exception of reducing the number of wire fraud counts from twenty-nine to twenty-seven, contained the same allegations as the Indictment.  The Government charged that, from about April 2000 through December 2002, Blatt and Herley were involved in a scheme to fraudulently inflate Herley's costs in contracts for voltage controlled oscillators (VCOs) and power heads with the United States Government and Lockheed Martin, the Government's primary contractor.[5]  As a result of this scheme, Blatt and Herley allegedly obtained money and property in the amount of approximately $3,932,550.        On May 5, 2008, Blatt entered into a plea agreement in which he agreed to plead guilty to a single-count Superseding Information the Government agreed to file.  The Government also agreed to move to dismiss all counts of the Superseding Indictment against Blatt.  During the plea colloquy, Blatt admitted the following facts, as stated by the Government, were true:

> [O]n or about March 23rd of 2000, the defendant, Lee Blatt, who was the chief executive officer of defendant Herley Industries at the time willfully failed to keep records that were required to be kept pursuant to Title 26 of the U.S. Code.  More specifically, . . .Mr. Blatt's evidence would show fail[ure] to make and keep records

---

[5] According to the Superseding Indictment, Herley supplied electronic components for aircraft radar systems to the United States military.  The electronic components included VCOs used by the Air Force in F-16 fighter jet radar systems, and power heads used by the Navy in its E2-C planes, also known as Hawkeyes, stationed on aircraft carriers.  VCOs contain a signal generator and an oscillator that amplifies signals, and are "used by on-board F-16 radar systems to track objects in the sky and on land."  Superseding Indictment, at 3 (Pl. Ex. D).  Power heads are used by planes with on-board radar systems, and function as fuses between the power source and the radar, protecting the radar from power surges.  Superseding Indictment, at 4 (Pl. Ex. D).

Herley manufactured and sold these components through its divisions, Herley-Vega, which manufactured and sold the VCOs to the Air Force and military contractors, and General Microwave, which manufactured and sold power heads to the Navy and Navy contractors.  Herley grew, in part, by acquiring businesses.  When Herley acquired Vega Precision Laboratories, that division of Herley became known as Herley-Vega.  When Herley acquired General Microwave, that division of Herley became known as the General Microwave division of Herley.  Superseding Indictment, at 4, Pl. Ex. D.  Herley, through its Herley-Vega and General Microwave divisions, was the only company successful at manufacturing VCOs and power heads to military specifications, and therefore the only company from which VCOs and power heads could be purchased.

> with respect to an 18,000 dollar payment made by Herley Industries to Syracuse University. The payment was for work done in the year 2000 on a redesign of a part of an item that's known as a voltage controlled oscillator, or VCO for short. And that work was done for Herley Industries. Because Mr. Blatt did not keep records that would show how the work done by Syracuse should have been allocated, including for what year it should have been allocated, Mr. Blatt violated the recordkeeping requirements of Section 7203 as would be charged in the superseding information.
>
> Mr. Blatt's failure to keep adequate records regarding this 18,000 [dollar] research expense is demonstrated by the fact that Herley Industries later submitted the expense to the defense contract audit agency, also known as the DCAA, as attributable to a 1999 VCO contract when it was not. None of the work that was done by Syracuse University engineering students and faculty was done for that 1999 VCO contract. That 18,000 dollar payment was made to Syracuse for work done no earlier than 2000.

Tr. Guilty Plea/Sentencing Hearing 5/5/08, Pl. Ex. I, at12-13. Subsequent to its filing, Blatt pleaded guilty to a Superseding Information charging him with one count of failure to keep a tax record he was required to keep for Herley Industries, in violation of 26 U.S.C. § 7203. The Court sentenced Blatt to one year's probation, a $25,000 fine, 500 hours of community service, a $25 special assessment, and the cost of prosecution, $1,715.02. The Court also granted the Government's motion to dismiss all of the charges against Blatt contained within the Superseding Indictment.

On May 5, 2008, Herley agree to plead guilty to Counts 28 and 29 of the Superseding Indictment, charging "obstruction of federal audits, in violation of 18 U.S.C. § 1516, when, with intent to deceive or defraud the United States, the defendant obstructed federal auditors by withholding certain cost and pricing data relating to the defendant's bids on the two Power Head contracts described in Counts 28 and 29 of the Superseding Indictment." Superseding Indictment, at 25, 26, Pl. Ex. D. Each count involved a different contract with the Navy for the sale of power heads, one was executed in 2001, the other in 2002. Herley Guilty Plea Agreement, Pl. Ex. H, 1. The Government agreed to move to dismiss the remaining counts, Counts 1 through 27 and Counts 30 through 33 of the Superseding Indictment. The parties also agreed the amount of the loss to the

Government was $2.5 million. The Government stated the following factual basis for the plea:

> Defendant Herley Industries, through its Farmingdale, New York facility . . . which was formerly General Microwave, Incorporated, obstructed federal auditors with respect to two bids on contracts for Power Heads for the United States Navy. . . . The United States Navy awarded one contract to Herley Farmingdale in July 2001 for forty-two Power Heads at a cost of 19,093 dollars each for a total of 801,906 dollars. The Navy awarded the second contract to Herley Farmingdale in February of 2002 for 139 Power Heads at a cost of 17,263 dollars each for a total of 2,399,557 dollars.
>
> Witness testimony, corroborating documents would show that Herley Industries through Herley Farmingdale impeded federal auditors by providing them with false information and by withholding accurate data. The evidence would show that in support of its bids, Herley Industries intentionally obstructed the auditors from learning information relevant to the auditors' analysis of Herley Farmingdale's estimate for labor hours in its proposal for the manufacture of Power Heads. The information withheld would have cast [doubt] on the accuracy of Herley Farmingdale's bid.
>
> At trial, the government would prove that Herley Industries obstructed federal auditors through the testimony of government contracting agents, government financial and technical auditors, private sector contractors who worked with Herley Industries and former and current employees of Herley Industries including engineers who specialize in microwave technology.
>
> The government would further rely on corroborating documents including documents generated and preserved by Herley Industries. These documents include contemporaneous reports on material and labor costs generated by Herley Industries and notes in documents from Herley employees relating to the pricing of Power Heads in the bids and false information provided to the government during the pre-award audits.
>
> The audits that are the subject of Defendant Herley Industries' plea are audits that occurred prior to the award of the Power Head contracts to Herley Industries. Because Herley was the sole supplier of the needed Power Heads, the government could not use a competitive bidding process to ensure fair and reasonable price for the Power Heads. Under such circumstances, pre-award audits are used to verify that a sole supplier, such as Herley Industries, provides true and accurate information and reasonable estimates about its costs and expenses including its historical cost for the same item. To evaluate a bid, an auditor has the right to review the supplier's actual costs and expenses from prior contracts for the same item as well as any other information used by the contractor to calculate or to estimate its expected expenses and profits for the contract at issue. It is the responsibility of the auditor to analyze the information supplied by the contractor and to use it to evaluate the reasonableness of the estimates and assumptions used by the contractor to generate the bid under

consideration.

In 2000 through 2002, sole-source contract, valued in excess of 500,000 dollars was subject to pre-award audits. And that is the time period in which the solicitations for this bid and the responses were under consideration. The defense contract auditing agency, DCAA, was the military's agent for pre-award audits of sole-source bid. DCAA sometimes engage[d] the assistance of defense contract management agency personnel. DCAA did the financial review. DCMA did the engineering and technical review. The bids at issue here were each the subject of pre-award audit by DCAA and related pre-award engineering and technical reviews by DCMA personnel. In December 2000, the Navy issued a solicitation to Herley Farmingdale for bid for twenty-one new Power Heads which was later increased to forty-two. In February 2001, Herley quoted a price to the Navy of 19,500 each for new Power Heads. The quoted price was about four times what the government had expected to pay based on its most recent negotiation.

In March 2001, the Navy requested that DCAA conduct an audit of the bid. The audit was conducted in April 2001 and a report issued in May 2001. While the audit report was pending, the Navy had a meeting with Lockheed-Martin and Herley Industries in May 2001. At the meeting, the naval officer in charge of ensuring an adequate supply of Power Heads discussed the Navy's serious and immediate need for Power Heads. During the bid negotiation process, indeed, the Navy told Herley Industries that it expected to solicit a second bid. In fact, in April 2001, the Navy did so while the first bid was still pending and subject to negotiation.

A second solicitation was for fifty Power Heads and that number was later increased to 139. In response to the second solicitation, Herley bid 19,093 dollars and later reduced its bid to 18,775 dollars. This bid, too, was the subject of an audit by DCAA.

During the course of the April 2001 audit on its bid for the first Power Head contract, Herley Farmingdale made representation and provided documents for the auditor to justify its claimed cost. To support its bid, Herley Industries represented to the auditor that the yield on the production of elements, that critical part of the Power Head, had dropped drastically. Yield meant the number of successful elements produced in one production run. A lower yield [meant] that more work was needed to manufacture an element which would result in higher labor costs. Herley Farmingdale represented to the Navy that the method which had been used previously to manufacture Power Heads had grown obsolete, that the old machinery used to produce the element had been affected adversely by the company's move to the Farmingdale site after its 1999 acquisition by Herley Industries.

It further represented that the retirement of technicians had left the company without experienced workers who knew how to use the machinery. As a result, Herley Farmingdale reported the ratio of successful elements manufactured per run had

fallen to six percent. In support of its claim, Herley Farmingdale provided the auditor with the results of three production runs. However, Herley Industries intentionally withheld from the auditor the fact that there had been a fourth production run with a yield in excess of twenty-two percent. The information regarding estimated labor hours that Herley provided to the auditor was based on the claimed yield of six percent per run. Herley Industries told the auditor that it required about forty hours of labor to produce one element. Both before and after its acquisition, it was Herley Farmingdale's practice to book the labor hours for making Power Heads to overhead, not to the contract. Therefore, there was no historical data which reflected the actual labor hours for the production of elements. Government witnesses would testify that approximately five to ten labor hours were needed to produce an element.

In May 2001, on the basis of the DCAA audit, the parties negotiated a contract price of 19,093 dollars for each of the forty-two Power Heads.

In August 2001, the government notified Herley Industries that it would audit its bid on the second contract. That audit took place over three days, one in September 2001, one in October 2001 and one in December of 2001. Herley Industries represented to the auditor that it was in the process of manufacturing the forty-two Power Heads for which it had already contracted with the Navy. This allowed Herley Industries to give to the auditor what appeared to be information based on production even though there was none. For this audit, Herley again falsely claimed that its yield on the production of elements was in the range of six percent. Herley also created a detailed labor estimate for the auditor about the amount of labor required to manufacture one element. The government's evidence would show that the labor estimate was premised on the unreasonable assumption that there would be a complete failure at each step which would require the step to be repeated. The labor estimate also added engineering and prevention and oversight hours in excess of those reasonably necessary. The DCMA auditor asked to meet with the Herley Farmingdale high level technician but Herley Farmingdale said that he was not available and no such meeting ever took place.

Plea Colloquy, Pl. Ex. I, 21-28.

Herley, through its representative, Herley Chairman and CEO Myron Levy, admitted the Government's statement of facts was true with the following modifications[6]:

---

[6] Herley stated these modifications were for the purpose of making the record as clear as possible for the collateral civil proceedings that arose following Herley's indictment, and asked the Court not to interpret the comments as diminishing or deflecting responsibility by Herley. Herley further agreed there was an adequate factual basis for the plea and Herley was accepting criminal responsibility for violating 18 U.S.C. § 1516 with respect to the two pre-award audits on the power heads contracts.

[O]n the bottom of page 4 and on the top of page 5 of the government's memorandum, it states ". . . impeded federal auditors by providing them with false information and by withholding accurate data." Herley interprets this to mean that in both Power Head audits, Herley did not disclose the results of run 4 of the element production with an intent to deceive the auditor. And Herley should have disclosed this data in response to the auditor's inquiry about the anticipated yield for the elements during production.

On the bottom of page 5 of the government's memorandum it states: "These documents include contemporaneous reports on material and labor costs generated by Herley Industries and the notes and documents from Herley employees relating to the pricing of Power Heads in the bids and the false information provided to the government during the pre-award audits." Again, Herley interprets this to mean documents relating to run 4 . . . .

On the top of page 5 of the government's memorandum, it states: "Because Herley Industries was the sole supplier of the needed Power Heads, the government could not use competitive bidding processes to ensure a fair and reasonable price for Power Heads." Herley admits that it was the sole-source supplier but disagrees with the government's contention about the availability of a competitive bidding process. This is, however, not material to the proceeding today. And we bring it to the Court's attention only to ensure that the record is clear.

On page 7 of the government's memorandum, the government contends that: "The quoted price was about four times what the government had expected to pay based on its most recent negotiation." Herley does not agree with that statement but we do not consider that to be a contention that is necessary for a . . . finding of a factual basis for the plea . . . .

On page 9 of the government's memorandum, it states: "Government witnesses would testify that approximately five to ten labor hours were needed to produce an element." Herley acknowledges that the government could call witnesses to offer such testimony but [does] not concede the correctness of such testimony. Again, this is not material to the proceeding today and we only bring it to the Court's attention to ensure the record is clear.

On page 9 of the government's memorandum, it states: "For this audit," that being the second audit, Your Honor, "Herley again falsely claimed that its yield on the production of elements was in the range of six percent. Herley also created a detailed labor estimate for the auditors about the amount of labor required to manufacture an element. The government's evidence would show that the labor estimate was premised upon the unreasonable assumption that there would be a complete failure at each step which would require the step to be repeated. The labor estimate also added engineering intervention and oversight hours in excess of those reasonably necessary. The DCMA auditor asked to meet with Herley Farmingdale

9

> high level technician but Herley Farmingdale said that he was not available and no such meeting ever took place." Herley does not question that the government has witnesses prepared to offer such testimony. Herley admits that it did not disclose the results of run 4 of the element production for the audit of the second Power Head contract with the intent to deceive the auditors and that Herley should have disclosed this data in response to the auditor's inquiries about the anticipated yield for the elements during production. The remaining allegations by the government are not necessary for the proceeding today.
>
> Finally, . . . we would note that the government's references to these Power Head contracts being with Herley is not technically accurate. The contracts were actually with Herley's wholly-owned subsidiary, General Microwave Corporation. And many of the employees involved in these actions were, as a technical matter, employed by General Microwave Corporation not by Herley. This does not mean that there is not a factual basis for the plea given the involvement and the wrongdoing by one or more of Herley employees.

Plea Colloquy, Pl. Ex. I, 29-32. After Herley pleaded guilty to obstruction of federal audits, Counts 28 and 29 of the Superseding Indictment, the Court sentenced Herley to a fine of $3.5 million and a special assessment of $800.

The first of five securities action lawsuits, brought by investors[7] in Herley alleging securities laws violations, was filed on June 15, 2006. The actions were eventually consolidated in this Court as *In re Herley Industries Inc. Securities Litigation*, 06-2596. The Consolidated Amended Complaint, filed on February 5, 2007, named Herley, Blatt, and certain other Herley directors and officers as defendants. Plaintiffs alleged that the defendants, in contracting with the Government, Herley's largest customer, had submitted "fraudulent, false, and inflated cost data to the Government." Cons. Am. Compl., 4. The defendants had thus been able to secure Government contracts at far higher prices than Herley would have received with the submission of true and

---

[7]In the securities action, investors seek to certify themselves as a class consisting of all persons or entities who purchased or otherwise acquired the common stock of Herley Industries, Inc., during the period from October 1, 2001, to June 14, 2006, inclusive, and who sustained a loss as a result of said acquisition(s).

accurate cost information, resulting in inflated reported revenues, earnings, margins, and share prices.

On July 6, 2006, certain Herley shareholders filed two derivative actions against the Herley Board of Directors. The actions were consolidated in this Court as *In re Derivative Litigation, Herley Industries Inc.*, No. 06-2964. The shareholders sought "to remedy defendants' violations of federal and state law, including breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment that occurred between October 2001 and the present (the Relevant Period) and that have caused substantial losses and other damages to Herley, such as to its reputation and goodwill." Verified Cons. Deriv. Compl. at 1. The Herley shareholders alleged defendants had allowed Blatt "to fraudulently bid on United States government military procurement contracts by fabricating manufacturing costs on contracts with the U.S. Department of Defense," and the Board had subsequently failed to hold Blatt accountable for his damage to Herley. *Id.* Verified Consolidated Derivative Compl. 1. Instead, the Board elected to terminate Blatt "without cause," and granted Blatt a general release of any claims Herley might have against him, so as to avoid exposure of individual defendants for their own misconduct. *Id.*

On January 11, 2007, Herley and Federal entered into an Interim Funding Agreement by which, pending a final determination on coverage, Federal agreed to advance defense costs to Herley under the Executive Protection Portfolio policy, Policy Number 8156-3872. Federal reserved all rights under the policy with respect to the coverage request, including the right to deny coverage or rescind the policy. Federal advanced $2,228,088.74. Shortly after May 5, 2008, Federal ceased reimbursement of any defense costs, declaring the claims were not covered based upon the guilty pleas of Herley and Blatt, and demanded return of the $2,228,088.74. On November 13, 2008, Herley filed this action seeking payment under the policy for $5,133,149.99 in expenses associated

with Blatt's defense to the Indictment and Superseding Indictment, and $2,432,990.45 in expenses associated with the defense of the Securities and Derivative Claims. Herley also asserts it is not obligated to return the $2,228,088.74 advanced by Federal under the Interim Funding Agreement.

**DISCUSSION**

The parties ask this Court to determine whether the insurance policy exclusions bar coverage. Summary judgment may be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "When confronted with cross-motions for summary judgment, the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the summary judgment standard." *Schlegel v. Life Ins. Co. of N. Am.*, 269 F. Supp. 2d 612, 615 n.1 (E.D. Pa. 2003) (citation and internal quotation marks omitted).

The parties agree Pennsylvania law governs in this case, so this Court will look to Pennsylvania law in analyzing the parties' arguments.[8] When insurance contract terms are "clear and unambiguous, a court is required to enforce that language." *Medical Protective Co. v. Watkins*, 198 F.3d 100, 103 (3d Cir. 1999) (citing *Standard Venetian Blind Co. v. American Empire Ins. Co.*, 469 A.2d 563, 566 (1983)). A term is ambiguous if it is "reasonably susceptible to more than one interpretation." *Id.* (citation omitted). "In determining whether a contract is ambiguous, the court

---

[8]"Under Pennsylvania's choice of law principles, [the Court] look[s] to the law of Pennsylvania, the state where the policy of insurance was contracted and delivered, for guidance in construing" an insurance policy. *McMillan v. State Mut. Life Assur. Co. of Am.*, 922 F.2d 1073, 1074-75 (3d Cir. 1990) (citation omitted).

must examine the questionable term or language in the context of the entire policy and decide whether the contract is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Id.* (citations and internal quotations omitted). Ambiguities are also to be construed in favor of the insured and against the insurer. *Id.* (citation omitted). "[E]xclusions are always strictly construed against the insurer and in favor of the insured." *Nationwide Mut. Ins. Co. v. Cosenza*, 258 F.3d 197, 206-207 (3d Cir. 2001). "Where an insurer relies on a policy exclusion as the basis for its denial of coverage and refusal to defend, the insurer has asserted an affirmative defense and, accordingly, bears the burden of proving such defense." *Madison Const. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999).

Federal first argues the fraudulent acts/willful violation exclusion, which states Federal will not be liable for any claim "based upon, arising from, or in consequence of any deliberately fraudulent act or omission or any willful violation of any statute or regulation by [an] Insured Person, if a judgment or other final adjudication establishes such a deliberately fraudulent act or omission or willful violation," bars coverage as to Blatt's defense in the criminal action. Herley argues there was no adjudication to which the exclusion could apply because the charges set forth in the Indictment and Superseding Indictment were dismissed and bear no relation to the misdemeanor offense charge in the Superseding Information to which Blatt pleaded guilty. Herley asserts the only adjudication as to Blatt involved the Superseding Information, which does not even qualify as a claim under the terms of the policy because it was a separate proceeding commenced by the return of an information and not an indictment as required by the policy. Herley states it does not seek to recover loss based on, arising from, or in consequence of the charge in the Superseding Information. Herley also contends Federal cannot argue the exclusion applies to the acts charged in the Indictment and the Superseding Indictment based on the acts charged in the Superseding Information because

13

there is no factual similarity.

The policy's definition of a claim is unambiguous. A claim under the policy includes "a criminal proceeding commenced by the return of an indictment." The language of the exclusion, however, is ambiguous as to what "based upon, arising from, or in consequence of" means. The exclusion states a claim "based upon, arising from, or in consequence of" a "willful violation of any statute," and which willful violation is established by a judgment or other final adjudication, is barred from coverage under the exclusion.

The claim is the entirety of the criminal action against Blatt, "commenced by the return of an indictment," and ending in Blatt's conviction by guilty plea, a final adjudication, to willfully failing to keep a record pertaining to the allocation of an $18,000 research expense, in violation of 26 U.S.C. § 7203, a federal criminal tax statute.[9] The filing of the Superseding Information did not, as Herley argues, commence a new and separate proceeding. The Superseding Information was part of the same proceeding initiated by the return of the Indictment. As reflected in the plea agreement, the Superseding Information was the result of Blatt's agreement with the Government. Blatt agreed to plead guilty to the Superseding Information the Government was to file, and, in return, the Government agreed to move to dismiss all Superseding Indictment counts against Blatt. The dismissal of the charges in the Superseding Indictment did not occur in isolation and the dismissal was not an acquittal. Had Blatt not pleaded guilty to the Superseding Information as he had agreed, the Government would not have moved to dismiss the Superseding Indictment.

---

[9] In the context of the federal criminal tax statutes, willfullness means "a voluntary, intentional violation of a known legal duty." *Cheek v. United States*, 498 U.S. 192, 201 (1991) (citation omitted). "Willfulness, as construed by our prior decisions in criminal tax cases, requires the Government to prove that the law imposed a duty on the defendant, that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty." *Id*.

14

Moreover, the Superseding Indictment and the Superseding Information are unquestionably related. In the Superseding Indictment, the Government charged that, from about April 2000 through December 2002, Blatt and Herley were involved in a scheme to fraudulently inflate Herley's costs in contracts for VCOs and power heads with the United States Government and Lockheed Martin. The Superseding Indictment also stated Blatt obstructed a Department of Defense audit by "falsely and fraudulently represent[ing] that [Herley] had spent $18,000 on the 1999 contract for VCOs for work done by Syracuse University" even though Syracuse "had done no work on the 1999 VCO contract." Superseding Indictment, at 12, Pl. Ex. D. The plea agreement provided greater detail regarding Blatt's willful failure to keep a record. During his plea colloquy, Blatt admitted this factual basis to the plea agreement was true, and he pleaded guilty to the Superseding Information. The claim for coverage of Blatt's defense in the criminal action arose from his willful violation of a statute, 26 U.S.C. § 7203. Without Blatt having engaged in such misconduct, the criminal action would never have been brought against Blatt. Blatt's willful violation of the statute was also established by a final adjudication, Blatt's guilty plea. Blatt's claim is thus barred from coverage under the policy by Exclusion 7(c).

Federal next argues the fraudulent acts/willful violation exclusion bars coverage as to Herley's defense of the civil actions because of the guilty pleas entered in the criminal action. Federal also contends coverage cannot be allocated because the exclusion applies to bar coverage in its entirety if any portion of the claim for which coverage is sought involved a fraudulent act established by a judgment or other final adjudication. As to Herley's guilty plea, Herley argues the plea was not a judgment or other final adjudication that triggers the exclusion because a sentence imposed pursuant to a guilty plea is distinct from a judgment or other final adjudication on the merits, and the policy is ambiguous as to whether the exclusion extends to guilty pleas. Herley

15

further argues there is an insufficient connection or similarity between the guilty plea act and the acts alleged in the civil actions.

Herley's claims are barred by Exclusion 8(b), which requires no payment for claims arising from a deliberately fraudulent act or omission or any willful violation if a final adjudication establishes the fraud or willful violation. The policy's terms are clear. Contrary to Herley's assertion, a guilty plea is not distinct from a final adjudication on the merits. Under Pennsylvania law, "a conviction from a guilty plea is equivalent to a conviction from a trial-by-jury . . . because a guilty plea constitutes an admission to all facts alleged in the indictment." *M.B. ex rel. T.B. v. City of Philadelphia*, 128 Fed. Appx. 217, 225-26 (3d Cir. 2005) (citing *DiJoseph v. Vuotto*, 968 F. Supp. 244, 247 (E.D. Pa. 1997)); *Commw. Dep't of Transp. v. Mitchell*, 535 A.2d 581, 585 (Pa. 1987)). Convictions from guilty pleas "are conclusive evidence of the criminal acts." *Stidham v. Millvale Sportsmen's Club*, 618 A.2d 945, 952 (Pa. Super. Ct. 1992); *see also* U.S.S.G. § 4A1.2(a)(1) (defining a prior sentence as "any sentence previously imposed upon adjudication of guilt, whether by guilty plea, trial, or plea of nolo contendere, for conduct not part of the instant offense."). Even if a guilty plea were not generally considered a final adjudication, Herley's sentencing and judgment could be considered the final adjudication in Herley's criminal action. Following Herley's guilty plea, Herley was sentenced, and judgment was entered. Herley did not appeal. Because guilty pleas are equivalent to convictions by trial and are conclusive evidence of the criminal acts, Exclusion 8(b) extends to guilty pleas. *Cf. First Nat'l Bank Holding Co. v. Fidelity & Deposit Co. of Md.*, 885 F. Supp. 1533, 1537. (N.D. Fla. 1995) (finding frivolous plaintiff's contention criminal convictions were not final adjudications because they were based on guilty pleas, rather than jury verdicts).

Having concluded Herley's guilty plea was a final adjudication under the policy, this Court must determine whether the civil actions are "based upon, arising from, or in consequence" of the

deliberately fraudulent misconduct to which Herley pleaded guilty in the criminal action. Federal and Herley agree "arising from" is akin to "arising out of." Herley, citing *Mfr.'s Casualty Ins. Co. v. Goodville Mutual Casualty Co.*, 170 A.2d 571, 573 (Pa.1961), asserts "but for" causation, or a cause and result relationship, satisfies the "arising out of" provision of the policy. Federal asserts "arising out of" means "causally connected with." Both are correct.

"Arising out of" is not an ambiguous term. *Essex Ins. Co. v. RMJC, Inc.*, 306 Fed. Appx. 749, 752 (3d Cir. 2009). "[C]ourts applying Pennsylvania law have held the phrase denotes but for causation both where it defines what is included in coverage and where it delineates exclusions." *Id.* (citing *Forum Ins. Co. v. Allied Sec., Inc.*, 866 F.2d 80, 82 (3d Cir. 1989); *Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 109-10 (Pa. 1999)). In Pennsylvania, courts have construed "arising out of" to mean "causally connected with, not proximately caused by."[10] *McCabe v. Old Republic Ins. Co.*, 228 A.2d 901, 903 (Pa. 1967); *See id.* (holding that "'arising out of' means causally connected with, not proximately caused by. 'But for' causation, i.e., a cause and result relationship, is enough to satisfy this provision of the policy"); *Goodville Mutual Casualty Co.*, 170 A.2d 571, 573 (construing the words "arising out of" in an automobile insurance policy to mean "causally connected with" and not "proximately caused by."). Pennsylvania courts have also interpreted the phrase "arising out of" as connoting a broader notion of "but for causation." *Cher-D, Inc. v. Great Am. Alliance Ins. Co.*, No. 05-5936, 2009 WL 943530, at *6 (E.D.Pa., Apr. 7, 2009)

---

[10]In contrast, the Supreme Court of Pennsylvania has interpreted the words "resulting from" in an insurance contract as meaning proximate causation. *Cher-D, Inc. v. Great Am. Alliance Ins. Co.*, No. 05-5936, 2009 WL 943530, at *6 (E.D. Pa., Apr. 7, 2009) (collecting cases).

(collecting cases). "But for" causation has been held to satisfy the "arising out of" language. *Erie Ins. Exch. v. Eisenhuth*, 451 A.2d 1024, 1025 (Pa. Super. 1982) (citing *Mfr.'s Casualty Ins. Co.*, 170 A.2d 571); *see also Tuscarora Wayne Mutual Ins. Co. v. Kadlubosky*, 889 A.2d 557, 563 (Pa. Super. Ct. 2005) ("The phrase 'arising out of' has been equated with 'but for' causation." (quoting *Roman Mosaic & Tile v. Aetna Cas. and Sur.*, 704 A.2d 665, 669 (Pa. Super. Ct. 1997))).

This Court concludes "but for" Herley's deliberately fraudulent misconduct, the claims would not have arisen and the civil actions would not have been filed. The consolidated securities action complaint alleged defendants had submitted fraudulent cost data to the Government and violated the securities laws as a result of public statements touting the health of Herley's relationship with the Government, Herley's primary client. Had Herley not engaged in obstructing federal auditors, there would have been no allegation of securities laws violations. Similarly, with the derivative action, defendants were alleged to have breached fiduciary duties, abused control, engaged in gross mismanagement, wasted corporate assets, unjustly enriched themselves, and caused substantial losses and damages to Herley. The conduct alleged was directly related to the fraudulent conduct adjudicated in the criminal action because the defendants were accused of allowing the misconduct alleged in the criminal action to occur. The securities and derivative actions therefore arose from the adjudicated criminal actions and are thus barred from coverage under the policy.

Federal also argues it is entitled to recoupment of the amounts it advanced for these actions. Section 16(e) of the policy states that defense costs shall be repaid to Federal by Herley upon a determination the defense costs are not insured. This Court has determined the defense costs are barred from coverage. Herley must repay the amount it was advanced by Federal under the Interim Funding Agreement.

An appropriate order follows.